## ATLANTIC COAST LINE RAILROAD *v.* THE CITY OF GOLDSBORO.

(Filed 31 May, 1911.)

1. Equity — Jurisdiction — Police Powers — Roads and Streets — Obstructions—Injunction.

Courts of equity have no jurisdiction to restrain an incorporated city from the exercise of its governmental authority conferred upon it by its charter regulating the grading of its streets, and an ordinance passed by the city in the exercise of its police power is valid which provides that a railroad company traversing with its track one of its streets in the heart of the business portion, where there are cross streets, shall level the railroad roadbed with the street which had been recently lowered so as to make them conform to a general scheme of street grading.

2. Police Powers—Cities and Towns—Roads and Streets—Railroad Obstruction—Gradings—Ordinances.

The railroad of plaintiff traversed the defendant town on its principal business street, and owing to a general system for grading the streets the street was lowered, so that plaintiff's railroad bed stood at a higher level of six to eighteen inches, or more, to the danger of the citizens of the town in passing and repassing. *Held,* an ordinance of the town requiring the plaintiff to lower its tracks to a level with the street at the expense of the railroad company was a lawful exercise by the town of its police power. In this case this power of the city was expressly provided for in the charter of the company.

3. Police Powers — Railroads — Charters — Prescription — Public Requirements—Roads and Streets—Obstructions—Grading.

A railroad company accepts a charter from the State in contemplation of and subject to the development of the country, and with the expectation that cities and towns would require new or improved streets across rights of way acquired, and, therefore, by

prior occupancy a railroad company can obtain no rights which would impede or render dangerous streets of incorporated towns to whom the power had been granted, in the exercise of their police power for the benefit of the citizens.

4. Corporation Commission — Railroads — Gradings — Roads and Streets — Cities and Towns — Police Powers — Supplementary Powers.

Revisal, sec. 1097 (10), authorizing the Corporation Commission to require railroads to raise or lower their tracks at a crossing, is supplementary to and not in derogation of the exercise by the State, or an incorporated town authorized by it, of such police powers.

5. Railroads—Rights of Way—Limitation of Actions—Police Powers —Grading—Cities and Towns.

Revisal, sec. 388, providing that a railroad company, etc., shall not be barred by the statute of limitations as to its right of way, etc., does not affect the State or a municipality in the assertion of its right to require a railroad company to change the grade of its roadbed where it is crossed by streets, so that public travel and drainage may not be impeded.

6. Cities and Towns — Roads and Streets — Railroads — Shifting Freight—Ordinance—Penalties.

Upon the question as to whether a town ordinance is valid in this case which restricted the time of "shifting" upon a railroad track situated in the business part of the town, the Court was equally divided, ALLEN, J., not sitting.

APPEAL by plaintiff from order of *W. J. Adams, J.,* vacating a restraining order, heard by consent at chambers in Raleigh, 16 January, 1911. From WAYNE.

The facts are sufficiently stated in the opinion of the Court by *Mr. Chief Justice Clark.*

*W. C. Monroe, George B. Elliot, and George M. Rose for plaintiff.*

*D. C. Humphrey and Aycock & Winston for defendant.*

CLARK, C. J. The A. C. L. Railroad, originally the Wilmington and Weldon Railroad Company, occupies with its track the chief street of the city of Goldsboro. Its right of way, 65 feet on each side of its roadbed, embraces the whole of what is known as East and West Center streets, which extend north

and south the entire length of the city. The right of way was originally acquired about 1835, and the town has been built up on either side and became incorporated in 1847. The city of Goldsboro under the authority of the powers granted in its charter has instituted a system of grading its streets and of drainage extending through the city. In pursuance of this work the roadbed of the railroad on Center Street in some places is now 6 inches and from that to 18 inches higher than the grade of that street and of the other streets of the city which cross East and West Center streets at right angles.

The city authorities have passed an ordinance providing that "all railroad companies owning tracks on East and West Center streets, between Walnut and Vine streets in said city of Goldsboro, are hereby required to lower said tracks so as to make the same conform to the grade line of said streets and said tracks to be filled in between rails; the grade line of said street being as follows: Beginning at the present grade line corner of Walnut and East and West Center streets, to be lowered 6 inches to corner of Mulberry and East and West Center streets, 10 inches to corner of Ashe and East and West Center streets, and 18 inches to corner of Vine and East and West Center streets." Another section of the ordinance provides that failure or refusal to comply with the ordinance should be a misdemeanor and fined $50. The plaintiff attacks this ordinance as being unconstitutional and void, and seeks to enjoin all enforcement of the ordinance by a criminal proceeding.

The city has heretofore graded and paved at its own expense said East and West Center streets outside of that part of the streets occupied and used by the defendant as its roadbed. The injunction was refused and the plaintiff appealed.

The city has from time to time laid out numerous streets crossing said right of way and has worked and maintained its streets and cross streets for more than 60 years, including all of East and West Center streets outside of the actual space occupied by plaintiff's roadbed.

As a general rule, a court of equity has no jurisdiction to restrain a State from prosecuting for a violation of its statutes and ordinances. The ordinances in question were made by the

city in pursuance of its governmental authority. We need not enter into the learned and elaborate discussion as to what cases, if any, present exceptions to this general rule, for we are of the opinion that the ordinance requiring the plaintiff to lower its track from 6 to 18 inches at the points where the cross streets pass over the railroad track is a legal exercise of the public authority vested in the defendant.

The plaintiff took its charter expecting that towns and cities would grow up along the line of its road, and knowing that with the development of the country new roads and, in the cities and towns, that new streets would be laid out across its right of way. And it took its charter knowing, too, that the State would have the right to lay out such roads and new streets, and to require the railroad to make such alterations as would prevent the passage over its track by the public being impeded.

In *English v. New Haven,* 32 Conn., 241, it was held that the city had the right to require the railroad company to widen the crossing of a street over its track or to make such other changes as the public convenience and necessity might require in order that there should be no hindrance to the public in crossing the railroad track. In *R. R. v. Bristol,* 151 U. S., 556, it was held that the imposition upon a railroad company of the entire expense of a change of grade at a railroad crossing is not a violation of any constitutional right.

In *Cleveland v. Augusta,* 102 Ga., 233, 43 L. R. A., 638, the subject is fully discussed in a very able opinion which holds that a railroad corporation must make such alterations in the change of its grade as will conform to the new grading of the streets adopted by the city. In *R. R. v. Duluth,* 208 U. S., 583, it was held that "The right to exercise the police power is a continuing one, that cannot be limited or contracted away by the State or its municipality, nor can it be destroyed by compromise, as it is immaterial upon what consideration the attempted contract is based. Such power when exercised in the interest of public health and safety is to be maintained unhampered by contracts and private interests; hence, an ordinance by a city compelling a railroad to repair a viaduct constructed after the opening of a road is valid, though the city for a sub-

stantial consideration had contracted to relieve the railroad
company from making such repairs for a term of years."

In the present case, however, there was no contract exempt-
ing the railroad from changing its grade at such crossings
when required. Indeed, section 27 of plaintiff's charter, in the
Laws of 1833, expressly requires the plaintiff to do what the
city now requires. Said section provides: "It shall be lawful
for the said railroad company in the construction of its said
road to intersect or cross any public or private way estab-
lished by law; and it shall be lawful for them to run their road
along the route of any such road: *Provided,* whenever they
intersect and cross such public or private road the president or
directors shall cause the railroad to be so constructed as not to
impede the passage of travelers on said public road or private
way aforesaid." In *Minneapolis v. R. R.,* 98 Minn., 380, 28
L. R. A. (N. S.), 307, the Supreme Court of Minnesota held
that an almost identical provision in the charter of a railroad
company was as applicable to new public roads laid out across
the right of way as it was to old roads over which the right
of way ran, and said: "The purpose of incorporating this par-
ticular provision in the charter of the railroad company was in
the interest of the public and to require the railroad company
to keep in good repair all crossings at the intersection of high-
ways. . . . The evils intended to be guarded against are
the same, and apply equally to both new and old streets. There
was no reason why the Legislature should deem it prudent to
provide for existing highways only, and we do no violence to
the rules of statutory construction in holding that the provi-
sions of defendant's charter were intended to include all streets
and highways intersected by railroads, whether laid out before
or after building of the railroad. The expression of the statute
is special, perhaps; but the reason therefor is general. The
expression must therefore be deemed general. A railroad com-
pany accepts and receives its franchise subject to the implied
right of the State to lay out and open new streets and high-
ways over its tracks, and must be deemed, as a matter of law, to
have had in contemplation at the time its charter was granted,
and is bound to assume, all burdens incident to new as well as

existing crossings." The same doctrine has been held in Maine, Connecticut, Illinois, New York, Tennessee, Indiana, Texas, Mississippi, Ohio, Nebraska, New Jersey, Vermont, Wisconsin, and by the United States Supreme Court. Indeed, the above case from Minnesota was affirmed, 214 U. S., 497.

In the above-cited case of *Cleveland v. Augusta,* 102 Ga., 233, 43 L. R. A., 638, the railroad ran across the public road, which was not then a street. When the territory was taken into the city its authorities changed the road to a street and raised the grade at that point, and required the railroad to raise its grade. This the railroad refused to do unless the city would pay the expense. The Court held that the railroad company was liable for the expense of raising its roadbed to conform to the city grade, and said that it must yield to the reasonable burden imposed by the growth and development of the country or the city, and where the public welfare demands a change of grade of the highway or street, the railroad company must, at its own expense, make such alterations in the grade of its crossings as will conform to the new grade. That case is exactly in point. In the course of its opinion the Court said: "Upon streets or highways crossed by it, or subsequently laid out, the railroad company must construct proper crossings (*Lancaster v. R. R.,* 29 Neb., 412; *R. R. v. Smith,* 91 Ind., 119, 13 Am. and Eng. R. R. Cases, 608); and must alter, change, or otherwise reconstruct such crossings whenever the public welfare demands. *Eng. v. New Haven Co.,* 32 Conn., 240." The doctrine is further clearly stated thus by the Court: "When the railroad company laid its track across the highway, it did so subject to the right of the public authorities to make such alterations or changes in the highway, either by lowering or raising the grade, widening or otherwise improving the same, as the public safety and welfare might require. In doing so, the presence of the railroad necessitates a certain character of crossings and safeguards which otherwise would not exist; and with however much plausibility it might be argued that the public authorities should be required to do just such work as they would have to do did the railroad not exist, it is certain that the railroad company should bear the burden of such work as

is made necessary by reason of the peculiar and dangerous character of its operation. The principle of the common law is embodied in this statute. It is the railroad which makes the construction of a railroad crossing necessary, whether the highway be laid out before or after the construction of the railroad."

In *R. R. v. Minn.*, 208 U. S., 583, it is said: "As the Supreme Court of Minnesota points out in its opinion, 98 Minn., 380, the State courts are not altogether agreed as to the right to compel railroads without compensation to construct and maintain suitable crossings at streets extended over its right of way after the construction of the railroad. The great weight of State authority is in favor of such right. See cases cited, 98 Minn., 380. There can be no question as to the attitude of this Court upon this question, as it has been uniformly held that the right to exercise the police power is a continuing one, that it cannot be contracted away, and that a requirement that a corporation or an individual comply with reasonable police regulations without compensation is the legitimate exercise of the power and not in violation of the constitutional inhibition against the impairment of obligations of contract." Here, the city in pursuance of its right, has graded the streets of the city and put in a system of drainage, both of which are impeded by the railroad maintaining its roadbed on Center Street from 6 to 18 inches above the level of the streets crossing it, its roadbed extending through the entire length of the city on this main street.

The plaintiff earnestly contends that, inasmuch as Rev., 1097 (10), authorized the Corporation Commission to require the raising or lowering by a railroad of its track or highway at any crossing and to designate who shall pay for the same, this deprives the city of Goldsboro of the right to exercise its police power in that regard. The provision just cited giving the Corporation Commission the power stated is not in derogation of that conferred in the charters of towns and cities, but is supplementary merely.

The plaintiff also contends that Rev., 388, providing that no railroad company, etc., shall be barred by the statute of

limitations as to its right of way, etc.,. by occupation of the same by any person whatever, deprived the city of the right there claimed. This is a misconception. The defendant is not contending for the ownership of the soil of East and West Center streets. It is merely asserting its right to require the railroad company to change the grade of its roadbed where it is crossed by the other streets so that public travel and the drainage of the city may not be impeded.

A further ordinance of the city prohibits the railroad from doing any "shifting on East and West Center streets between Spruce and Ash at any other time than hours of 6 :30 and 8 :30 A. M. and from 4 :30 to 6 :30 P. M. or to allow any car to stand for a longer period than 5 minutes at any point on East and West Center streets between Spruce and Ash, under a penalty of $50 for each offense. East and 'West Center streets constitute the main street of the town, and that portion of it between Spruce and Ash—four blocks—is the very heart of the city. In a former action, in which the plaintiff in this case was a defendant, *Dewey v. R. R.,* 142 N. C., 392, the plaintiff herein, which was the defendant in that action, alleged in its answer as follows: "The operation of the trains along said Center Street increases annually and the danger accordingly; trains are constantly passing and the crossings, notwithstanding the utmost diligence and care on the part of the railroad, are necessarily blocked. Said Center Street is the main business street in the city; it is frequently crowded with pedestrians and vehicles, and the operation of so many trains daily throughout the length of said street is fraught with danger to life and property." This statement, admission, and averment of the plaintiff herein, made under oath, is set up in answer in this case, in which an injunction is sought, and it is admitted in the reply.

We understand the ordinance, in forbidding "shifting" within the limited space of four blocks, on the main street in the center of the town, to refer to what is commonly understood by that expression, to wit, the "cutting out and putting in" cars in the making up of a train before it is dispatched on its journey. Such a regulation certainly cannot be held void, and is a reasonable exercise of the police power necessary for the convenience

and safety of the public at the four crossings designated. Whether such ordinance would be reasonable in smaller towns is a question not before us.

We certainly do not understand the term "shifting" to refer to the "transfer" of a train of cars already made up and to be delivered by the plaintiff company to another railroad company to be transported. The ordinance does not apply to the transfer of a car or cars from one railroad to another through the city. Whether an ordinance forbidding the transfer of the cars from one railroad to another through said street except at specified hours would be reasonable, in view of the fact that at Goldsboro such cars can be transferred by way of the physical connection of the tracks of all the railroads on the edge of town at the new union station, might admit of debate. But that question is not before us. The plaintiff railroad company has its shifting yards further out, where its trains can be made up and where at least the chief part of the necessary shifting can be done. Certainly it is a reasonable exercise of the police power to forbid such "shifting" except at specified hours, on four blocks of the plaintiff's track, in the heart of the town.

The plaintiff's official returns show $223,000,000 of property owned by it. The defendant's counsel having adverted to the very large proportion of this property held by the plaintiff in this State, the plaintiff's counsel replied that Goldsboro had only 6,107 population, and contended that for "a little town like that to interfere with the operation of so vast an enterprise" was, to use his expression, "like the tail wagging the dog." It is such a mistaken standpoint that doubtless induced the plaintiff on this occasion, and has so often induced such corporations, to assert what they deem their rights in defiance of the evident convenience and desires of the public by means of whose patronage such corporations thrive and make their profits. It is true, the city of Goldsboro is not large. But the powers it has exercised in making these ordinances, it exercises in the name of and by the right of the sovereignty of the people of this State. From that sovereignty the plaintiff derives its rights and its very existence. It was incorporated solely for the public

convenience and subject to public regulation. Its stockholders were exempted from personal liability and it was granted the power of the State's right of eminent domain to procure its right of way and to exercise its vocation. The right of the plaintiff to derive a profit from its business is an incident of a private nature and subject to the right of the sovereign to regulate its operations and to "alter or repeal its charter, at will." Cons., Art. VII, sec. 1.

The requirement by the authorities of Goldsboro that the plaintiff railroad shall at its own expense ($3,400) change its grade where its road is crossed by other streets to conform to the grade adopted by the city, and its prohibition of "shifting" to make up trains on the main street of the town, within four blocks in the heart of the city, except in specified hours, are lawful exercise of the police powers conferred upon the city by the sovereign power in the State. *Cooper v. R. R.,* 140 N. C., 229; *Wilson v. R. R.,* 142 N. C., 348; *Gerringer v. R. R.,* 146 N. C., 35. The only unreasonable aspect of the controversy is that the plaintiff should have resisted such requirements instead of yielding immediate assent or indeed preventing the necessity of the passage of such ordinance, by anticipating the wishes of the public in a matter so essential to the safety, comfort, and health of the town.

Affirmed.

BROWN, J., concurring in part. The following ordinances of the city of Goldsboro are attacked by the plaintiff upon the ground that they are an unlawful interference with the chartered property rights of the plaintiff, as well as an impediment in the discharge of its duty to the public, viz.:

SEC. 2. That the shifting limits on East and West Center streets shall be on the south from Spruce Street to the city limits, and north from Ash Street to city limits.

SEC. 3. That it shall be unlawful for any railroad or railway company to do any shifting on East and West Center streets, between Spruce and Ash streets, at any other time than from the hours of 6:30 to 8:30 A. M., and from 4:30 to 6:30 P. M. Any railroad or railway company violating this ordinance shall be subject to a fine of $50 for each offense.

SEC. 4. That it shall be unlawful for any railroad or railway company to place any car and allow said car to stand for a longer period of time than five minutes at any point on East and West Center streets, between Spruce and Ash streets. Any railroad or railway company violating this ordinance shall be subject to a fine of $50 for each offense.

SEC. 5. That all railroad and railway companies owning tracks on East and West Center streets between Walnut and Vine streets in said city of Goldsboro are hereby required to lower said tracks so as to make the same conform to the grade line of said streets, and said tracks to be filled in between the rails; the grade line of said street being as follows: Beginning at the present grade line, corner of Walnut and East and West Center streets, to be lowered 6 inches to corner of Mulberry and East and West Center streets, 10 inches to corner of Ash and East and West Center streets, and 18 inches to corner of Vine and East and West Center streets.

I concur fully in the opinion of the *Chief Justice* in so far as it refers to Ordinance No. 5, requiring the railways entering the city to lower their tracks at street crossings so as to conform to grade line of the streets.

This requirement does not interfere with the traffic of the railways or impede them in the performance of their obligations as common carriers, and evidently will add materially to the safe and convenient use of the streets. This ordinance seems to be supported by the weight of authority. But I find no authority to support the ordinance fixing shifting limits and undertaking to prohibit the use of portions of plaintiff's tracks for shifting purposes during the large part of both the day and night; and none has been cited to us.

I take it to be settled now by abundant authority that when it is shown that a municipal ordinance unlawfully interferes with the chartered rights, duties, as well as business, of a common carrier, and will seriously obstruct the carrier in the discharge of its duties to the public, the enforcement of such ordinance will be enjoined.

In *Dobbins v. Los Angeles,* 195 U. S., 223, the Supreme Court of the United States says: "It is well settled that where prop-

erty rights would be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity." *Smith v. Ames,* 169 U. S., 466; *Prentiss v. A. C. L. R. R.,* 124 U. S., 228; *Waterworks v. Vicksburg,* 185 U. S., 82; *Milwaukee E. R. and L. Co. v. Bradley,* 84 N. W., 875.

In *Schlitz Brewing Co. v. City of Superior,* 93 N. W., 112, 1, the Supreme Court of Wisconsin says: "This Court has recently had the general subject under discussion, and, after full consideration, has laid down the rule that equity may enjoin such prosecutions where they are resorted to or threatened as a means of preventing the enjoyment of property rights and there is not any way to adequately remedy the mischief."

The principle upon which injunctive relief may be given in cases of this character is stated by this Court in *R. R. v. Olive,* 142 N. C., 265: "Injunctive relief against interference with the use of the right of way of a railroad company is not given because of any special consideration for these corporations, but because they are public agencies chartered, organized, and given the right of eminent domain in the contemplation of law to serve the public; they are a part of the system of highways of the State." The Federal courts take the same ground, and for a similar reason. "It is settled," said the Court, in *Southern Exp. Co. v. Ensley,* 116 Fed., 756, "that a court of equity should enjoin the enforcement of a municipal ordinance, though violations of it are punished criminally, when its enforcement will effect the illegal destruction of, or a grave interference with, a corporate franchise, in the operation of which the public have an interest."

If this were not true, any municipal corporation by repeated arrests of the carrier's servants, for violation of some ordinances, might bring its trains to a standstill, paralyze its business, and seriously injure the interests of the public, who are dependent upon the carrier's service.

The defendant's counsel based the right to enact the switching ordinances upon the police power of the city, contending that it is *per se* a nuisance to conduct such operations in a public

street, because dangerous to persons crossing the street and disagreeable and annoying to those doing business and residing on both sides of the plaintiff's track.

In the first place, the plaintiff's track is not a public street, although there is a public street partly on the right of way on both sides of the track. The plaintiff was chartered by the General Assembly before the defendant, and acquired its right of way and built its road some years before the defendant became a municipality.

In the second place, operating a railroad, whether in moving its trains or in switching its cars, is a lawful business; and a business properly conducted under the sanction of law cannot be a nuisance *per se,* as is held by the Supreme Court in *Transfer Co. v. Chicago,* 99 U. S., 640. It is said in that case: "A Legislature may and often does authorize and even direct acts to be done which are harmful to individuals, and which, without authority, would be nuisances; but in such a case, if the statute be such as the Legislature has power to pass, the acts are lawful, and are not nuisances unless the power has been exceeded."

In the case of *Atchison, T. and S. F. Ry. Co. v. Armstrong* (Kan.), 80 Pac., 978, the Court says that an authorized business properly conducted at an authorized place is not a nuisance, for whatever is lawful cannot be wrongful. To same effect is Cooley on Torts, p. 67.

It was held in *Drake v. R. R.,* 7 Barb., 508, that a railroad passing through streets in New York City when the cars were drawn by steam power, into a crowded part of the city, was not *per se* a nuisance. Similar decisions are *R. R. v. Applegate,* 8 Dana, 289; *Moses v. R. R.,* 21 Ill., 516; *Murphy v. R. R.,* 21 Ill., 516.

In *Yates v. Milwaukee,* 77 U. S., 498, the Supreme Court of the United States holds that "The question of nuisance or obstruction must be determined by general and fixed laws, and it is not to be tolerated that the local municipal authorities of a city declare any particular business or structure a nuisance, in such a summary mode, and enforce its decision at its own pleasure." In that case, *Mr. Justice Miller* says: "This would

place every house, every business, and all the property of a city at the uncontrolled will of temporary local authorities."

In commenting on the powers of municipal corporations to declare what is a nuisance, Smith in his Modern Law of Municipal Corporations, vol. 2, sec. 1106, says that "the city council may not, by a mere resolution or motion, declare any particular thing a nuisance which has not theretofore been pronounced to be such by law, or so adjudged by judicial determination."

In a note to the above is the following: "In *Chicago, etc., R. Co. v. City of Joliet,* 79 Ill., 25, an action by the city to enjoin the railroad company from running its trains through the public streets and over certain public grounds of the city, which the city council by ordinance has declared to be a nuisance, the Supreme Court of Illinois reversed the court below, which had granted the injunction, and remanded the case with directions to dismiss the bill, declaring that they would regard the ordinance as without effect upon the case, although the charter conferred upon the common council the power to abate and remove nuisances, and to punish the authors thereof, and to define and declare what shall be deemed nuisances, upon the authority of *Yates v. Milwaukee,* 10 Wall., 497, and *S. v. Mayor, etc.,* 29 N. J. Law, 170.

This is not only the universal doctrine in this country, but is so held in England: *Ry. Co. v. Brand,* 4 Eng. and Ir. App., 171-196, in which case it is said that "No court can treat that as a wrong which the Legislature has authorized."

In the case of *New Orleans v. Lenfant,* 126 La., No. 17995, 52 So. Rep., 575, it is held that "An ordinance which absolutely prohibits the doing of things, upon property which appears to be the subject of private ownership, which are harmless in themselves, and may or may not become nuisances, according to the manner in which they are done, is unconstitutional, because it seeks unduly to regulate and trammel the use of such property; and where it imposes arbitrary and unreasonable obligations, it is illegal, for that reason." In that case the city of New Orleans by ordinance undertook to prohibit the railway

155—24

company from parking its cars on its own tracks on Elysian Fields Street, and the ordinance was held to be an infraction of the company's chartered rights.

This principle is clearly recognized and enforced by this Court in *Thomason v. R. R.,* 142 N. C., 318, wherein it is held: "When a railroad company acquires a right of way, in the absence of any restrictions either in the charter or the grant, if one was made, it becomes invested with the power to use it, not only to the extent necessary to meet the present needs, but such further demands as may arise from the increase of its business and the proper discharge of its duty to the public.

A railroad company may, if necessary to meet the demands of its enlarged growth, cover its right of way with tracks and, in the absence of negligence, operate trains upon them without incurring, in that respect, additional liability either to the owner of the land condemned or others.

In *Taylor v. R. R.,* 145 N. C., 400, it is held that the lawful operation of a railway on its own right of way and premises cannot be an actionable nuisance, the Court saying that "the several acts charged against the defendant are well within its chartered powers, provided they are performed with reasonable care."

In *Morgan v. R. R.,* 98 N. C., 247, this Court recognized the right of a railroad company to move its engines and cars at will, when necessary, on its tracks along the streets of an incorporated town, *Mr. Justice Merrimon* saying: "The defendant certainly had the right on its roadway to move its locomotive with or without cars attached to it, in the orderly course of such work, to and fro in making up its trains, detaching cars from one already formed and shifting them from one train or place to another."

There is nothing in the *R. R. v. Baptist Church* case, 108 U. S., 317, which contravenes this principle, as is pointed out in *Taylor v. R. R., supra,* and in *R. R. v. Armstrong,* 80 N. W., 980. The railroad company had built a roundhouse and shops for storing, cleaning and repairing its engines, up against a church, and the Supreme Court sustained a recovery upon the

ground that the right given by Congress to enter the city of Washington did not authorize it to purchase a lot and build roundhouses and shops at any place it should select, the Court saying: "As well might it be contended that the act permitted it to place them immediately in front of the President's house or of the Capitol."

In commenting upon that case the Supreme Court of Kansas says: "The plaintiff was permitted to recover, but it was because the company had no authority to build its engine-house at the place where it did." *R. R. v. Armstrong, supra.*

In our case the plaintiff has the right to use its tracks, granted by the Legislature in 1845, for all purposes incident to its business as a common carrier. The movement of detached cars and shifting engines is as necessary to enable the plaintiff to discharge its public duties as is the running of its freight and passenger trains.

The plaintiff's freight depot is at the southern end of Goldsboro, and those of two other railroad companies are at the north end, and the tracks over which shifting is prohibited for twenty hours out of twenty-four connects the respective freight stations.

There must be a frequent shifting and transfer of cars from one carrier to the other, absolutely essential in the transportation of freight. To restrict the use of this track to four hours per day and to undertake to fix shifting limits is practical confiscation of plaintiff's chartered rights.

It is suggested that the railways can run their shifting engines and cars around the city of Goldsboro on a track constructed in recent years. This track runs through a passenger station and is used for the passage of the numerous trains of the three railways that enter Goldsboro.

It may be impracticable and dangerous to have such track used hourly by switching engines. That is a matter that must of necessity be left to the officials of the railways when they are acting within the powers conferred by the General Assembly. They are the persons to whom the law must look for the proper conduct of the business of the company and upon whom rests the burden of responsibility.

Whatever power the Legislature may have in the premises, it has not, in my opinion, conferred it upon the defendant; and therefore those ordinances are void.

In this age common carriers are held to the strictest rules and regulations, especially in the movement of freight. Heavy penalties are denounced against them for unreasonable delay. If the railroad companies are to be hampered and restricted in the legitimate exercise of their chartered rights by all sorts of regulations enacted by the municipalities through which their roads are laid, it will be impossible for them to discharge the public functions for the performance of which they were chartered.

Mr. Justice Walker concurs in this opinion. Mr. Justice Allen did not sit.